# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW JERSEY

INVENTEL.TV LLC,
        Plaintiff,

  -against-

FOOTPRINT INSOLE TECHNOLOGY, INC.,
and KITTYBABE TRADING LIMITED,
        Defendants.

Docket #  2:24-CV-00861

CIVIL ACTION

**BRIEF OF PLAINTIFF INVENTEL.TV, LLC IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Jeffrey Lubin, Esq.
InvenTel.TV LLC
200 Forge Way, Unit 1
Rockaway, NJ 07866
973-531-4423
jeff@inventel.tv

| **TABLE OF CONTENTS** | **Pg. #** |
|---|---|
| Table of Authorities | 3 |
| Introduction | 4 |
| Factual Allegations | 4 |
| Identification of Relevant Parties and Their Roles in Defamation and Extortion | 4 |
| Specific Defamatory Language Used; it is false | 5 |
| Evidence of Defamation and its location | 6 |
| Wrongful Disclosure of Confidential Information in Breach of Contract Provisions | 8 |
| Specific Examples of Wrongful Disclosures | 9 |
| Evidence of Extortion | 11 |
| InvenTel is being Damaged | 13 |
| Legal Argument | 13 |
| I. InvenTel Is Entitled to a Temporary Restraining Order and Preliminary Injunction | 13 |
| II. InvenTel Is Likely to Succeed On The Merits of its Claims | 15 |
| A. InvenTel Is Likely to Succeed On The Merits of its Defamation Claims | 15 |
| B. InvenTel Is Likely to Succeed On The Merits of its Confidential Information Claims | 16 |
| III. Irreparable Harm | 17 |
| IV. Balance of the Equities | 19 |
| V. Public Interest Impact | 20 |
| Conclusion | 21 |
| | |
| | |

| **Table of Authorities** | **Pg. #** |
|---|---|
| *Cipollone v. Liggett Group, Inc.*, 785 F. 2d 1108 (3rd. Cir., 1986) | 14, 17 |
| *Clear Ocean Action v. York*, 57 F.3d 328, 331 (3d Cir. 1995) | 14 |
| *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) | 14 |
| *Santosuosso v. NovaCare Rehabilitation*, 462 F. Supp. 2d 590, 600 (D.N.J., 2006) | 15 |
| *Opticians Ass'n v. Independent Opticians*, 920 F. 2d 187, 195 (3rd. Cir. 1990) | 17 |
| *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) | 17 |
| *Rastelli Partners, LLC v. Baker*, (D.N.J. 2023) (Civ. No. 23-2967 (RBK/AMD), July 21, 2023) | 17, 20, 21 |
| *Hermès Int'l v. Rothschild*, No. 22-cv-384, 2023 WL 4145518, at *9 (S.D.N.Y. June 23, 2023) | 18 |
| *ThermoLife International LLC v. Connors*, (D.N.J., 2014) (Civ. No. 2:13-4399 (KM), March 17, 2014) | 18, 20, 21 |
| *TD Bank N.A. v. Hill*, 928 F.3d 259, 283-84 (3d Cir. 2019) | 19 |
| *Trico Equipment, Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *9 (D.N.J. June 15, 2009) | 20 |
| *Great Caesars Ghost v. Unachukwu*, 2020 WL 2394052, at *4 (D.N.J. May 12, 2020) | 20 |
| *US v. Gonzalez*, 905 F. 3d 165, 191-192 (3rd. Cir., 2018) | 21 |

**Introduction**

Although, this is an action for breach of contract, and breach of license as well as other claims including Fraud.  This Order to Show Cause is related to new defamatory and extortionary acts as well as related breaches of  a non-disclosure agreement, all as part of an concerted effort by Defendants and their agents that have taken place since the filing of the Complaint.  As a result of the new acts, InvenTel is being greatly harmed.  It is also relevant to note that while there is extortion and defamation present and InvenTel continues to suffer damages, and while InvenTel intends to seek monetary damages for same in the future, this particular Motion is limited to seeking an Order that the Defendants and their agents cease all relevant and wrongful acts of defamation, extortion, and breaches of non-disclosure.  (Abdul Decl. ¶¶ 2-3)

**FACTUAL ALLEGATIONS**

*Identification of Relevant Parties and Their Roles*

*Defamation and Extortion*

Defendants and their agents are currently involved in an ongoing effort to harm Plaintiff and various others, including but not limited to myself as an individual, at least one other employee of Plaintiff as an individual, and an independent third-party, Tony Kerry.  Defendants are related.  As explained in the Complaint, a single individual, Jason Guadalara, is President and/or CEO of both defendants: Kittybabe Trading Limited ("Kittybabe") and FootPrint Insole Technology, Inc. ("FP").  Accordingly, while the defamatory and extortionary conduct described below primarily emanates from FP websites, social media, and email addresses, since the defendant entities can only act through their officers, employees, and agents, it is clear that an order to cease should cover Kittybabe as well.  (Abdul Decl. ¶ 4-5)

<u>*Specific Defamatory Language Used and It is False*</u>

1.  Defendants have been falsely and defamatorily accusing InvenTel and its employees of:

    a.  being "criminals",

    b.  being part of a "crime ring",

    c.  being part of "organized crime",

    d.  being part of an "international crime syndicate",

    e.  being part of a "massive fraud ring"

    f.  having "stolen" products and inventory from FP,

    g.  "selling stolen inventory",

    h.  having "stolen" FP's website,

    i.  having "hijacked" FP's website,

    j.  "stealing money from consumers",

(Abdul Decl. ¶ 6)

    <u>All of the above are completely and patently false accusations</u>.  Moreover, Defendants have known at the time that they made the accusations that they are all false.  Although all are false, the easiest to prove to be false and known by the defendants to have been false are those of a "stolen" website and "hijacked" website; paragraph 2 of the Exclusive Marketing, Distribution and Licensing Agreement ("EMDL") between the parties specifically gives InvenTel the "right, privilege, and license under any and all Property Right to Advertise and Distribute the Product through all Channer of Trade and Media." (Abdul Decl. ¶ 7). Further, the EMDL defines Channels of Trade and Media to include the "Internet" (Id). The EMDL defines Property Rights to include "domain names…(including without limitation, those identified in Exhibit 'B'". (Id). Finally, Exhibit "B" of the EMDL explicitly includes Defendants' website domain name:

fpinsoles.com. (Id).  Thus, it is impossible for InvenTel to "steal" or "hijack" something that was freely licensed to InvenTel by Defendants. (Id).

*Evidence of Defamation and Location*

Right now, on FP's Instagram page under the name fpinsoles the first pinned post alleges InvenTel of using a "Fake/Stolen Website" (Abdul Decl. ¶ 8).   In the same Instagram Post, in the comment section to the right of the page, Defendants accuse InvenTel that "anything [we] send is stolen from Footprint" (Abdul Decl. ¶ 9).  Further in the comments on the same page, they further specify the identity of who they are accusing, pointing out that we are an "imposter" in New Jersey (Abdul Decl. ¶ 10).  They further state they "have found many victims of [our] company!! It's going to be a Netflix documentary". (Id). Further down in the comments, FP accuses us of "steal[ing] money from consumers." (Id).  To further, identify us (in addition to being in "New Jersey", as explained above and the constant close up of "InvenTel.TV LLC ("Inventel")" being featured on the post (as is highlighted in yellow in the Abdul Decl.)) they also refer to us as a "marketing company" (which we are), and accused us of being an "organized crime ring" who "stole" their domain and cloned their site. They also state they have found "many other brands that are victim of this scam". (Id).

Just in case there is any confusion as to whether Defendants succeeded in making clear that it is InvenTel that they are referring to in all these posts and comments, one of the commenters on the page said it explicitly.  (Id, at ¶ 11).  And to top it all off, that comment received 2 "likes".  One of those likes was from Defendants.  (Id).

In another post on their Instagram page, they again say we "hijacked" their website, that we are "stealing domains from brands" and that we are a "crime ring". (Id, at ¶ 12).  In another post, that was recently on Defendant's Instagram page, Defendants again accuse us of hacking

their site and urging consumers to file chargebacks. (Id, at ¶ 13).  In another post from Instagram, which is animated, Defendants have a cartoon character popping up to point directly at InvenTel's name. (Id, at ¶ 14).  The dynamic animation draws the attention of the viewer so that there is no doubt who is being referred to.  Also, the red "police type" light in the top left of the images actually flashes in the animated, non-still-image version, further drawing attention.  (Id)

In yet another post, Defendants refer to us as "criminals who stole our web domain" and stated that we tried to "extort" them.  They said we are a "crime ring" and that "tons of other companies are being targeted".  (Id, at ¶ 15).  Notably, several of the images appeared nearly sequentially within a time frame of only several seconds on Defendant's Instagram feed/story. (Id)

Moving on from Instagram; on one of Defendants' websites, is a page that accuses InvenTel of being an "international crime syndicate" and "organized crime". (Id, at ¶ 16-17). Further down on the same webpage, we are accused of being an "organized crime ring", a "massive fraud ring operating out of NJ"  as well as "theft in the multi millions and crimes including fraud, extortion and identity theft."  They also state: "Many of the products are defective that didn't pass quality control or are likely fake and there is no return policy" and further that "many victims and we are currently being threatened and extorted not to talk" and more. (Id, at ¶ 17).  There is another cached version of a similar page which appears to look the same at the beginning; however, further down the page, the name "InvenTel" and its CEO, "Yasir Abdul" is present in multiple locations.  (Id, at ¶ 18).  In yet another version of the same page image that was forwarded to InvenTel by none other than Defendant's President / CEO, Jason Guadalajara, another  employee of InvenTel, counsel, "Jeffrey Lubin" (the undersigned), is

also listed as a member of the crime ring. (ID, at ¶ 19).  All of the complained of allegations

above are 100% false.  They are fully defamatory.  (Id, at ¶ 20).


<u>*Wrongful Disclosure of Confidential Information in Breach of Contract Provisions*</u>

Defendants are not only posting defamatory information, but they are also sharing

confidential proprietary information.  (Id, at ¶ 21).

Defendants and InvenTel are parties to an Exclusive Marketing Licensing and

Distribution Agreement ("EMDL").  In fact, breach of said EMDL is a main aspect of the

Complaint in this matter.  (Id, at ¶ 22). As set forth in paragraph 28 the complaint, the EMDL has

confidentiality provision.  specifically, pursuant to paragraph 18 of the EMDL, FP agreed that it

would not  "disclose Confidential Information of the [InvenTel]  to any third party without first

obtaining the express written permission of [InvenTel]…. [nor would it] issue a press release or

otherwise publicly disseminate any information concerning this Agreement or the transactions

contemplated hereby without prior written consent of [InvenTel]." (Id, at ¶ 23).  Further,

Paragraph 1(d) defines Confidential Information broadly to include: "the financial terms of this

Agreement and all nonpublic proprietary information of each party, whether or not written or

otherwise fixed in any form or medium, regardless of the media on which contained and whether

or not patentable or copyrightable, which is designated as (or which, by its nature, is inherently)

confidential, including, without limitation, trade secrets, technical specifications, customer or

client lists, business information, marketing programs, plans and strategies, financial

information, memoranda, work papers, notes, reports and sales information." (Id, at ¶ 24)

As also set forth in the Complaint (paragraphs 63-74), Defendants have been breaching

the confidentiality provisions of the EMDL. (Id, at ¶ 25).  We did not seek injunctive relief

immediately, however now with the multiple instances of serious and significant defamation as described above, the breach of confidentiality is a separate and independent ground for the relief sought in this motion. (Id, at ¶ 26).

To reiterate details of the breaches of confidentiality from the Complaint:

a.  on or about January 15, 2024, FootPrint's CEO (that is CEO of both FITInc. and Kittybabe) sent Inventel links to publications FootPrint made on Canva.com

b.  Included were pictures of the interior of Inventel's warehouse, which is private property and confidential.

c.  It describes FootPrint's relationship with Inventel as "A True Horror Story" right at the top.

d.  It states that Inventel "didn't make a significant sales increase and actually had less sales than we did ourselves in many months" (and conveniently leaving out that Footprint were embargoing the inventory).

e.  It states that FP "sen[t] 12,000 insoles and 1,500 shoes by ocean vessel" by the time he sent this to Inventel on January 15, 2024, it was already clear that FootPrint had been refusing to release that very same inventory to Inventel (see Complaint, **paragraphs 48-50**); yet, again that was conveniently and defamatorily left out of the publication.

f.  It falsely and defamatorily states that Inventel never paid "the remaining $17,000 in past due invoices" (see Complaint, **paragraphs 33-35**).

g.  And there are many other statements in that publication which are breaches of confidentiality as well as false, misleading, and defamatory.

*Specific Examples of Wrongful Disclosures*

Very recently, InvenTel received an email from a third-party, unrelated to this action in which Defendants reached out to discuss their confidential business relationship (Id, at ¶ 28). Further, lower down on the cached webpage discussed above, there is a video by another third party, Michelle Bong, who never had any agreement with InvenTel.  In the video and in the caption, Defendants admit to discussing the confidential aspects of their relationship with Ms. Bong.  Further, in the video (which Defendants posted to their webpage) Ms. Bong states that Jason "reached out [to her] saying 'please do not sign with Yasir; this is what's happening with all the brands.'" As a result. Ms. Bong decided not to enter into a contract with InvenTel (InvenTel decided not to enter into a contract with Ms. Bong as well, albeit for unrelated reasons). (Id, at ¶ 29).

Upon information and belief Defendants are sharing confidential information not just with the above two named parties but with every vendor and licensor that InvenTel does business with.  (Id, ap ¶ 30). As a further evidence of this, we presented text messages from Jason Guadalajara CEO of President and/or CEO of Defendants.  Beginning on or about January 2, 2024, Jason started advising InvenTel that he would be sharing confidential information publicly. He then did so on several other occasions.   First , on January 2, 2024, he threatened to blog. (Id, at ¶ 31).  Then he threatened to release a Netflix documentary. (Id).  Later that same day, he repeated the threat about a Netflix documentary, and referenced a famous one "fyre fest" for comparison.  (Id).  Then on January 3, 2024, he threatened to include InvenTel counsel, Jeffrey Lubin, in the blog as well as a photo. (Id).   Then, on January 15, 2024, he threatened to specifically include InvenTel's "internal operations". (Id).  Then, on January 16, 2024, he goes back to threatening a Netflix documentary. (Id).

Then when he got tired of sending text messages, he switched to emails. On February 27, 2024, he threatened to "publish everything and go viral," "write a book", and "make a net flix documentary". (Id).   On March 6, 2024, he threatened to publish and "expose detailing every detail of InvenTel's internal crime ring" (Id).  On March 13, 2024, he threatened to "Blast to 320 million people in the USA and the world…and never shut up…make a dedicated website and hand out qr codes to it on flier at every trade show, email blast the attendees lists, Walmart buyers, you name it." (Id, at ¶ 31)  Notably, our reputation in our trade is very important to us. we have an important relationship with Walmart, so defamation directed towards trade shows and Walmart buyers  would be particularly damaging to us. (Id, at ¶ 32).  The recent blogs and emails that we have seen are evidence that they were not simply empty threats, but he is actually doing so.  And he is doing so with false accusations as well.  (ID, at ¶ 33).

*Evidence Of Extortion*

One very interesting thing, is that as indicated above, Jason has been sending some of defamatory and Confidential Information to InvenTel. (Id, at 34).   Had he simply wanted to defame InvenTel or release its Confidential Information publicly, there was no necessity to share it with InvenTel.   This paradox leads InvenTel to conclude that the threats to defame InvenTel and threats to publicly release InvenTel's Confidential Information are part of a larger attempt by Defendants to extort InvenTel to make concessions regarding performance under the EMDL or seek favorable Settlement offers and responses.  (Id, at 35-36).

Other examples of Defendants attempts to extort InvenTel include a pattern of threats to have employees of InvenTel criminally prosecuted and they linked those threats with seeking favorable settlement offers and responses.  (Id, at 37).  On the morning of January 16, 2024, Jason wrote to InvenTel counsel, Jeffrey Lubin and said "Dude [in reference to InvenTel CEO,

Yasir Abdul] is going to jail and you too?" (Id, at ¶ 38).  Later that very day, Jason again wrote

to Mr. Lubin and made a settlement demand. (Id).  Asking for a settlement demand immediately

after a threat of jail is text book extortion.

On February 21, 2024, Jason wrote to Yasir Abdul, Jeffrey Lubin, and others in an email

entitled "RE: NJ DA" and indicated that counsel advised him that the probability of prosecution

is "very high". (Id., at ¶ 39).  One week later on February 27, 2024, Jason again wrote to Mr.

Abdul, Mr. Lubin and others, this time in an email discussing settlement negotiations, and

referred to "visiting these guys in prison" (Id, at ¶ 40).  That was at least the second time that

Defendants explicitly tied settlement to suggestions of prison or jail.

Three days later, on Friday night March 1, 2024, Defendants' counsel, Joshua Kushner,

joined the threat/extortion scheme and explicitly threatened: "We have the FBI now officially

involved. You are in sentence mitigation territory now. Ball is in your court. [referring to

increasing to InvenTel's settlement offer]" (now the third demand for a settlement at the threat of

prosecution). (Id, at ¶ 41).  However, since Mr. Lubin had already turned off his phone for the

sabbath, he did not get the message right away.  The following Monday morning, March 4, Mr.

Lubin inquired of Mr. Kushner, "So what is it that you want?" In response, Mr. Kushner

responded "$750,000" and other terms as well. This was at least the 4th demand for payment at th

threat of criminal prosecution / jail.  (Id, at ¶¶ 42-43).   Several hours later, having not received a

response, Mr. Kushner again wrote saying: "No response? Don't Say I didn't warn you."  (Id, at

¶ 44)  Just minutes later, as if in order to make the point clear, Mr. Kushner again wrote to Mr.

Lubin and ccd other parties with an email apparently instructing those other parties how to file

documents with the FBI.  (Id, at ¶ 45) There is no reason for Mr. Kushner to have sent that email

to Mr. Lubin other than to further pressure InvenTel to pony up the settlement. (Id, at ¶ 46).

Accordingly, that is at least the 5th time that the threat of prosecution was used in furtherance of an extortion scheme.  All of these acts both by Defendants' CEO / President, Jason Guadalajara, and by Defendants' counsel Joshua Kushner are extortionary and designed to exact concessions from InvenTel.  Upon information and belief Defendants' other acts described above, those of Defamation and disclosure of Confidential Information are being done for the same purpose and are part of the same pattern of activity.  (Id, at ¶¶ 47-48

<u>*InvenTel is Being Damaged*</u>

InvenTel is being damaged by the above defamatory and activity as well as by the above wrongful disclosures of Confidential Information.  I already discussed above that InvenTel has been contacted by one of third parties contacted. And that another already canceled contract negotiations due to Defendants defamation (Defendants even bragged about that and took credit for it). (ID, at ¶¶ 49-50).  Others have also contacted InvenTel.  In fact we were directed to several of the above images by third parties.  (Id, at ¶ 51).  All across the web and on social media thousands of followers of FP are reading all these false allegations about InvenTel. (Id, at ¶ 52).  InvenTel's reputation and goodwill, not to mention the reputations of Yasir Abdul and Jeffrey Lubin personally, are being tarnished by completely unfounded allegations of criminality. Id, at ¶ 53).

**LEGAL ARGUMENT**

**I. InvenTel Is Entitled to a Temporary Restraining Order and Preliminary Injunction**

As evidenced by the accompanying Declaration of Yasir Abdul, InvenTel has demonstrated good and sufficient reasons for the issuance of a temporary restraining order and preliminary injunctive relief. As demonstrated below, InvenTel is being irreparably harmed by Defendants' constant public defamation through repetitive accusations on its social media

channels and elsewhere of criminality, organized crime, massive fraud, international organized crime rings, theft from consumers and more.  InvenTel is also being irreparably harmed by Defendants' constant publication and dissemination of InvenTel's Confidential Information.

   InvenTel's reputation and goodwill is being irreparably harmed by the Constant allegations of criminal activity.  And the damage to InvenTel's goodwill and reputation is incalculable. The damage to InvenTel for the release of its Confidential Information is also irreparable.  Defendants have explicitly stated they are publishing InvenTel's internal operations.

   With regards to both the defamation and the Confidential Information, once the proverbial cat is out of the bag, it cannot be put back in.   The Third Circuit has acknowledged that fact.  In *Cipollone v. Liggett Group, Inc.*, 785 F. 2d 1108 (3rd. Cir., 1986), that court stated: once "the materials will be released; thereafter, it will be impossible, practically speaking, to rectify the harm." *Id*, at 1118.  Accordingly, a temporary retraining order is the only means by which InvenTel may ensure that this infringing activity will be stopped pending a hearing on its motion for preliminary injunction.

   Under Third Circuit law, the standard for issuance of a temporary restraining order is the same as that for a preliminary injunction . *Clear Ocean Action v. York*, 57 F.3d 328, 331 (3d Cir. 1995). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc*., 555 U.S. 7, 20 (2008). As discussed in detail below, InvenTel has demonstrated that it is entitled to a preliminary injunction, by showing that it (1) is likely to prevail on the merits of their defamation and breach of confidentiality claims, (2) will suffer irreparable injury absent the

issuance of an injunction, (3) that the balance of equities tips in its favor, and (4) the injunction is in the public interest. Accordingly, InvenTel is entitled to a temporary restraining order.

## II. InvenTel Is Likely to Succeed On The Merits of its Claims

### A.  InvenTel Is Likely to Succeed On The Merits of its Defamation Claims

Under New Jersey law, defamation is defined as: "(1) a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to a person or persons other than the plaintiff; (5) with actual knowledge that the statement was false or with reckless disregard of the statement's truth or falsity or with negligence in failing to ascertain the truth or falsity; and (6) which caused damage." *Santosuosso v. NovaCare Rehabilitation*, 462 F. Supp. 2d 590, 600 (D.N.J., 2006).

The statements in question are all defamatory factual statements. None are statements of opinion. Moreover, they are all defamatory in that they are statements regarding criminal status / activity.  These include, but are not limited to:

   a.      being "criminals",

   b.      being part of a "crime ring",

   c.      being part of "organized crime",

   d.      being part of an "international crime syndicate",

   e.      being part of a "massive fraud ring"

   f.      having "stolen" products and inventory from FP,

   g.      "selling stolen inventory",

   h.      having "stolen" FP's website,

   i.      having "hijacked" FP's website,

   j.      "stealing money from consumers"

As Yasir Abdul points out in his Declaration (Abdul Decl. ¶ 7), the statements are all completely false, and they were known by defendants to be false at the time they were made. The easiest to prove both the falsity of and defendants knowledge of such falsity, are the statements concerning the "stolen" and "hijacked" website.  Defendants freely granted an exclusive license to the website to InvenTel.  It is not possible for InvenTel to "steal" or "Hijack" something that was freely licensed to it by the Defendants.  Thus, the Statements are false and Defendants knew they were false at the time they were made.  The same is true for all of the statements.

Even though we only need prove negligence or recklessness with regard to the statements, we have shown actual knowledge of false statements by the Defendants.

The Statements were all communicated to third parties as they were posted on Defendants website (not the one discussed above) and social media / Instagram sites.  Several examples of actual postings are set forth in Yasir Abduls Declaration (Abdul Decl. pgs. 5-17).

## B.  InvenTel Is Likely to Succeed On The Merits of its Confidential Information Claims

Unlike, the Defamation Claims which are subject to a question of falsity, the Court need not evenask that question with regards to InvenTel's claims relating to Defendants' release and sharing of InvenTel's confidential information.  The parties are signatories to a contract, the EMDL, where paragraphs 1(d) and 18 specifically prohibit Defendants from disclosing Plaintiff's Confidential Information.  (Abdul  Decl. 21-27)  Defendants explicitly agreed to be bound by the confidentiality provisions.   Despite same, Defendants have been disclosing InvenTel's Confidential Information and have been threatening to disclose more. (Abdul Decl.

¶¶ 27 – 33).  He has explicitly threatened to disclose "inventels internal operations" (Abdul Decl. ¶ 31) and other confidential information.

### III. Irreparable Harm

The statements have irreparably damaged InvenTel (and several of its employees) (See Abdul Decl. ¶¶ 49-53).  Specifically, InvenTel's reputation (and those of its employees) are being irreparably harmed by the false defamatory statements categorically assigning criminality status and activity to it.  It has long been held that "Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Opticians Ass'n v. Independent Opticians*, 920 F. 2d 187, 195 (3rd. Cir. 1990); see also *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) (citing *Opticians*, 920 F.2d at 195)).

As indicated in Abdul Decl, ¶ 29, Defendants specifically reached out to Ms. Michelle Bong, who was in contract negotiations with InvenTel.  As a result, Ms. Bong decided not to contract with InvenTel (InvenTel decided not to enter into a contract with Ms. Bong as well, albeit for unrelated reasons).  Accordingly, as a direct result of Defendants' defamatory activity, InvenTel has already lost at least one contract.

As discussed above, once  "released, [] it will be impossible, practically speaking, to rectify the harm." *Cipollone v. Liggett Group, Inc.*, 785 F. 2d 1108, 1118 (3rd. Cir., 1986).  In a recent case, similar to this one in that the defamatory conduct included repeated accusations on social media such as alleging the Plaintiff to be "Mafia" and "organized crime*" Rastelli Partners, LLC v. Baker*, (D.N.J. 2023) (Civ. No. 23-2967 (RBK/AMD), July 21, 2023) (See Section II, Findings of Fact, point # 16; See Also Section III, Conclusions of Law).   That Court concluded:

That reputational harm is irreparable…Defendants unmitigated, calculated, and virulent attack on the Rastellis and their reputation is, as we said in our original order granting temporary injunctive relief, unusual in its vehemence and persistence. And as Brittani Baker testified, she has no intention of stopping these posts about the Rastellis, presumably absent a court order…The amount of harm that these posts caused, which, again, alleged without any evidence whatsoever that the Rastellis were involved with the mafia, is incalculable, and that loss of control of their reputation and goodwill—an essential component of the Rastellis' business and lives—constitutes irreparable harm. For the same reasons, any remedy at law, i.e., monetary damages, would not sufficiently remedy these reputational harms. As we have said, the amount of harm Defendants' actions have caused to the Rastelli's reputation and good will with the public and particularly with other businesses is incalculable. Additionally, as we have said, Brittani Baker testified that she does not intend to stop making these posts. See *Hermès Int'l v. Rothschild*, No. 22-cv-384, 2023 WL 4145518, at *9 (S.D.N.Y. June 23, 2023) (stating that a plaintiff has no adequate remedy at law if he can show that "absent an injunction, the defendant is likely to continue" with his course of harmful conduct).

Here too, Defendants have explicitly multiples expressed that they will not stop. They have repeated indicated that they will publish all the defamatory material as a "Netflix documentary" (multiple times), "publish everything and go viral", "write a book", "publish an expose", "blast to 320 million people in the USA and the world … **and never shut up**…fliers at every trade show, email blast the attendees lists, Walmart buyers". (Adbul Decl. ¶ 31).

In another similar case, where the complained of activity included online lies including accusations of blackmail, among others, the district court noted:

Plaintiffs allege that they have suffered an ongoing injury to their business reputation that is attributable to the continual tortious acts of Connors, and that no remedy at law is sufficient to stop this behavior. I am satisfied that the defamatory statements and tortious interference are **ongoing or likely to be repeated**. It appears from Plaintiffs' submissions that Defendant has continued to engage in an online campaign to damage Plaintiffs' reputation… [the defamatory activity has] continued **while this lawsuit is pending**.
*ThermoLife International LLC v. Connors*, (D.N.J., 2014) (Civ. No. 2:13-4399 (KM), March 17, 2014) (Section i, Injunctive Relief) (emphasis added)

Injunctive relief is particularly appropriate where the defendant has shown no inclination to discontinue an ongoing course of tortious activity… A

plaintiff subject to continual defamation or tortious interference with his business is not necessarily required to endure it and continually supplement his claims for damages; he is entitled to have the activity stopped.

*Id.*

Defendants have made it abundantly clear that they do not intend to cease their defamatory activity.  Perhaps more importantly, although Defendants began threatening defamatory activity, as far back as January, their actual online social media posts appear to mostly be from only after we filed the Complaint in this action and forwarded it to Defendants' attorney, just like was the case in *ThermoLife*:



## IV. Balance of the Equities

The third consideration for this Court is the balance of the equities of the parties.  The Court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted. See *TD Bank N.A. v. Hill*, 928 F.3d 259, 283-84 (3d Cir. 2019). In this case, it is clear that the balance of the equities tips in the favor of InvenTel.  With regards to both the defamatory activity and the release of confidential information the damage to InvenTel is clear.  As already shown above, it is irreparable harm.  The words of the *Rastelli Partners* court are particularly

appropriate: "The harm to the [Plaintiffs] if we do not grant the injunction is obvious. Their reputation will continue to greatly suffer if Defendants continue their nonstop buzzsaw campaign against them." *Rastelli Partners, LLC v. Baker*, (D.N.J. 2023) (Civ. No. 23-2967 (RBK/AMD), July 21, 2023) (See Section III, Conclusions of Law).  That is precisely the harm that InvenTel is experiencing.

That is in stark contrast to any potential "hardship" that Defendants would experience if the injunction were issued.  With regards to the defamatory activity, there are no protections for false defamatory statements; the *ThermoLife* court expressed it perfectly: "The only "hardship" imposed upon [Defendant] is that he refrain from engaging in tortious conduct." *ThermoLife International LLC v. Connors*, (D.N.J., 2014) (Civ. No. 2:13-4399 (KM), March 17, 2014) (Section i, Injunctive Relief).  Same here.  And with regard to the publishing of the Confidential Information, there is likewise no significant hardship.  Defendants only got access to the Confidential Information as a result of agreeing to the terms of the EMDL, the very same agreement that includes the confidentiality provisions.  Defendants freely waived the right to divulge that confidential information, and only thereby were able to get access to it.

> Defendants knew the terms to which they agreed. The only harms suffered by Defendants here are self-inflicted. See *Trico Equipment, Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *9 (D.N.J. June 15, 2009); see also *Great Caesars Ghost*, 2020 WL 2394052, at *4 (finding that, in granting injunctive relief against a defendant barring that defendant from continuing to violate a non-disparagement clause, the only harm suffered by the defendant would be that the defendant must now actually abide by the agreement's terms and that harm did not outweigh the harm the defendant was actively causing to the plaintiff's business reputation).

*Rastelli Partners, LLC v. Baker*, (D.N.J. 2023) (Civ. No. 23-2967 (RBK/AMD), July 21, 2023)

(See Section III, Conclusions of Law).

## V. Public Interest Impact

The fourth and final consideration is the public interest.  With regard to the Confidential Information, granting the "injunction furthers the public interest. The public is best served if the Court enjoins Defendants and obligates them to uphold their end of the bargain—a bargain to which they agreed… ("Although this matter involves a dispute between private parties, the public has an interest in the protection of private contractual rights.")".  Id, (citing to *Great Ceasars Ghost*).  Furthermore, with regard to the false defamatory comments, as they are false, they have little if any value.  See *ThermoLife International LLC v. Connors*, (D.N.J., 2014) (Civ. No. 2:13-4399 (KM), March 17, 2014) (Section i, Injunctive Relief).  Moreover,

> the Supreme Court has held that defamatory statements are not protected by the First Amendment, reasoning that "[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." … "there is no constitutional value in false statements of fact," … False statements of fact are not protected because "[n]either the intentional lie nor the careless error materially advances society's interest in `uninhibited, robust, and wide-open' debate on public issues.

*US v. Gonzalez*, 905 F. 3d 165, 191-192 (3rd. Cir., 2018).

Accordingly, there is no disservice to the public interest by issuing the injunctive relief sought.

## **Conclusion**

We have shown that InvenTel is likely to succeed on the merits, is being irreparably harmed by the defamatory acts and publication of Confidential Information by the Defendants, that the balance of equities favors Inventel, and that the public interest will be served by the issuance of the injunctive relief sought.  Accordingly, the Court should grant the within motion.

April 7, 2024                        Respectfully,

                                     /s/ Jeffrey Lubin

                                     Jeffrey Lubin, Esq.